131748 United States v. Kevani Ocasio-Ruiz Good morning, Your Honor. This is Anita Hill, arguing on behalf of Appellant Kevani Ocasio. This case, Your Honors, stems from a jury trial conviction that charged conspiracy to commit carjacking, aiding and abetting carjacking, aiding and abetting 924C charge, and a 924J charge, which is the causing of death through the use of a weapon. I should highlight, before I begin, that the facts of this case occurred in the year 2007, and it was not until the year 2012 that the case was actually indicted in the District of Puerto Rico. The defendant, after being convicted by a jury, was sentenced to life as to the carjacking counts and as to the 924J count. He was sentenced to serve 10 years as to the 924C count. This case rested exclusively on the testimony of one cooperating co-defendant, Garay Suarez. He essentially testified that the appellant and four others went to look for the victim in order to interrogate him, to question him about his possible snitching to a rival drug gang. Once they intercepted the victim, two of the co-defendants boarded the victim's car, and there was two cars involved, a Dodge Ram and the victim's car. They drove to a nearby place, they took the victim out of the car, and they took him to another location where they essentially shot and killed him. There is a controversy as to what the snitch exactly saw or heard, because at some point he testifies that he is sitting in the rear portion of the flatbed of the pickup truck and that there was a window that separated the flatbed from the inside of the truck, so he was unable to see and hear, and then at some point he said that the window had a slight crack, so he was able to see and hear when the appellant asked for the gun before he heard shots. After the crime was committed, the victim testified that he never saw nor worked for the appellant again. I should highlight that this was a case, like I said, that was indicted five years after it occurred. It stemmed from a faulty Police of Puerto Rico investigation that was inherited by the Federal Law Enforcement Agency. No weapons were seized in order to compare the ballistics that was found at the crime scene. The Dodge Ram vehicle that was allegedly used was never found, and the victim's Nissan was also never found. Therefore, there were no fingerprints and no DNA evidence that was able to be gathered in this case. So, like I said, it rested on the testimony of Guy Rice-Waters, who was a cooperating co-defendant. As to my first issue, I raised the fact that the District Court potentially committed error when it disallowed the defense to introduce a statement against penal interest that was proffered by a deceased co-conspirator's mother. The statement was made by the deceased co-conspirator to his mother, alleging or stating to her that he had been the one that had shot the victim in this case, and that this case had not been a carjacking, but that it had just been a simple murder, and he had been the one who shot the victim. That was essentially the statement that was made. The mother was the one who proffered the statement at the trial. Judge Fouste, before admitting or excluding the statement, asked the defense to present it by way of proffer. So the mother gave a proffer, and after the proffer, the court determined that although it agreed it was a statement against penal interest, it did not agree that there were sufficient corroborating circumstances attesting to the trustworthiness of the statement. In essence, Your Honors, the proffer was as follows, that on June 2, 2008, the mother testified that her son came up to her and said, I murdered the victim in this case, Joseph Seymour. I acted alone, I acted by myself, it was not a carjacking, and that the son and the mother had agreed that on the following day, they would go to the authorities and report what had happened. So that never happened because that occurred around 3.30 in the afternoon and around 5.30 in the afternoon on that same day, the declarant was shot and killed when he stepped outside of his house. So the mother essentially never went to the authorities. The district court was very concerned with the fact that the mother, the declarant at the trial, did not, waited four years to come forward with the statement. And I understand that you say the district court committed error in considering the mother's trustworthiness as opposed to the underlying declarant's trustworthiness. But I've read the proceedings and I do not agree with you. What I believe the district court looked at the underlying declaration to see what indicia of trustworthiness there were and found none. And I find in your briefs no arguments that would suggest you put in any evidence as to his trustworthiness. The statement is obviously exonerating of the defendant, but on your own accounting of the chronology of the events, in 2008 the defendant was not under criminal liability. It wasn't until 2012. So why would there be a spontaneous statement from her son that he is the one who committed a simple murder before there are any charges against anyone? I think the evidence shows, Your Honor, that the spontaneous comment to his mother came as a result of the fact that he was being persecuted. I think he was under imminent threat of death. From which gang? We don't know that. Wasn't there also some proper testimony by a reverend about his religious conversion? Yes, there was a proffer in support of the corroborating circumstances threshold that there was this pastor who came in and said that two weeks prior to the spontaneous statement, this person, the declarant, had come to see him and had told him that he needed to find peace and that he wanted to essentially, I guess, have a conversation with God and that he noticed that this person was very nervous and very anxious. But no details were exchanged as to what the content of it was. It was more of a state of mind kind of proffer. So the theory is it's a pre-dying declaration. He wants to get this off his soul. Is that the corroborating evidence of trustworthiness? No, Your Honor. I think that the strongest corroborating evidence in this case would be the fact that he's telling his mother. He's not going to the police. I think that's worth much more than if you're going to the police. That what he's telling his mother is, I did it. He's doing it in his home. He's not doing it like in a police station where perhaps he would be under some pressure. Upon his impending death, which is what the record suggests, we could interpret that he could have felt that he was under some threats of death. And as a result of that, he could have easily have said, you know, it was X or Y, these people who are after me and want to kill me. And that's not what he's saying. He's saying it was me and I acted alone. I think the mother's coming forward four years later, I think that that can be countered by the fact that Kivani wasn't arrested until five years late. Your time is running short. Could we hear you for a minute on the photograph? Yes. The photograph was brought in on redirect examination of the cooperating co-defendant. It was a photograph that depicted the appellant holding a gun. The objection was timely and well-made because the origins and the whereabouts of the gun did not relate to the conspiracy. As a matter of fact, it was postdated two years after. All right. We will turn to Justice Souter now and see if he has some questions. No, I don't have any. You've covered what mine would be. Thank you. Okay. Thank you, Counselor. I'll now give permission to adjourn. Good morning, Your Honors. My name is Francisco Bistoso Martinez. Please, you're going to have to speak up more. My name is Francisco Bistoso Martinez, and I represent the government. The government asks that this honorable court affirm Mr. Ocasio-Ruiz's conviction and sentence. This case revolves around two main evidentiary issues, both of which the government contends that were correctly decided by the district court. As to the first issue, the defense argues that the district court abused its discretion or committed error in excluding witness testimony relating to statements against interest supposedly made by a co-conspirator, Luis Maldonado Cruz, otherwise known as Balita. There was no such error in this instance. In order for an out-of-court statement to be admissible under Rule 804b-3 as a statement against interest, when used to exculpate a defendant, it must be shown that a declarant is unavailable. A statement in question is, in fact, a statement against interest and that there are corroborating circumstances that clearly indicate the trustworthiness of that statement. Weren't the first two prongs met? That's correct, Your Honor. So what corroboration do you think would have been necessary in order to make this statement admissible? Well, the rule does not elaborate as to the meaning or definition of corroborating circumstances. It's sort of left to the judge, isn't it? Yes, it's discretion of the judge. The main purpose of the corroborating circumstances is to avoid instances of fabrication where one person takes the full blame away from another as a means to exonerate the defendant. And it's in that spirit that the requirement should be applied as to instances that would constitute corroborative evidence. I would say other independent, non-hearsay evidence that goes towards the trustworthiness of the underlying statement of the declarant. That can be in the form of evidence presented at trial or maybe even the statement can be itself a self-corroborating statement in instances where it's said in the same form to two or three different witnesses, which was not the case here. In this case, the evidence that was presented for purpose of corroborating evidence was the testimony of the pastor Edgar Monsadis who himself said that he had little to no individual interaction with the deceased declarant. His one-time meeting with him was in the context of a larger prayer group session in which he said that he perceived the now-deceased declarant as being nervous and that it was this, quote, spiritual perception that his days were numbered. Well, it's an interesting assumption that sons don't lie to their mothers. We don't know. There was no corroboration even on that score. But if you have concluded with your argument on this point, may we ask about the photograph? Of course, Your Honor. As to the issue of the photograph of the appellant holding a gun, their main argument is that the court failed to do a balancing test under Rule 403 and the fact that the picture was taken after the facts that led to this case, the carjacking and murder of Mr. Seymour. Wasn't the court asked several times to do a balancing test? Yes, it was, Your Honor, and I believe the record shows that it stated that it would as the evidence developed. I do not believe that because he did not explicitly express that there was a Rule 403 balancing test, that it did not occur. In other words, we have to infer that it occurred somehow from his silence? I would suggest that the district court judge knows the law and knows what he needs to do before admitting or excluding evidence. Why was it admitted? It's a 2009 photograph. The shooting occurred in 2007. What was the basis for admission? The basis for admission was for a very limited purpose. During cross-examination, the witness's credibility was put into question when the defense pointed out that he had told local authorities that he had seen Mr. Ocasio-Cortez in his home with firearms and that a subsequent search warrant that had been obtained in reliance of those statements failed to produce any guns in that home. The purpose of the photograph was to show that there was involvement with firearms by Mr. Ocasio-Cortez. And don't you think that photograph would have been at least a bit harmful to the defendant in the case? Harmful? Well, it's a matter of degree. The government certainly isn't required to whitewash its case against a defendant and the defendant is not protected against all prejudice, just undue prejudice. In this case, the district court made a... Except it didn't. We have no basis for knowing the ruling of the district court. He said, I'll let it in, and then he repeated that statement and that's it. Yes, and then he provided the jury with a very limiting jury instruction stating the purposes of the photograph. And what did he say? He stated that he received the photograph for the limited purposes of corroboration evidence as to whether the defendant had had involvement with firearms. But that doesn't really get to the point that it's involvement with firearms around the time of the murder. This photograph, as I understand it, postdates the murder by some period of time, apparently, a couple years, and there was no evidence as to where the photograph came from. Let's assume that I was at a firing range legitimately and somebody took a picture of me. Does that necessarily back into the use that you made of the photograph? Well, in this particular instance, the testimony of Mr. Garay was that he looked at the photograph, he identified Ocasio-Cortez, and he identified the gun as one of those that he had seen Mr. Ocasio-Cortez in the possession of Ocasio-Cortez during their interactions. What was the origin of the photograph? What you told the judge was it came from the files of the U.S. attorney. What was the origin of the photograph? Did an agent go take it at some point during an investigation? Was it from a family album? The exact source, I am not certain. Why not? You are here representing the government. Yes, I seem to have overlooked that part in my preparation for today. I do remember that it came from an agent. It came from the agents. And do you know how the agent got it? Right now, I am not certain. I could certainly provide that further information. Was it provided to the district court? I believe so. In chambers, aside from the jury, yes. Is there any record evidence of that that we can read that it was provided? I believe it is in the transcripts during the discussions of the defense's objection to the photograph that the district court stated that the government had given the origins or the source of the photograph. From each of you, please, we would like a Rule 28J letter identifying in the record any information about the source of this photograph. Of course, Your Honor. At this point, we will ask Justice Souter if he has any questions. Thank you again. You covered what I would have asked. Thank you. Thank you both.